Carl Vickers, Inc. v. Commissioner.
Carl Vickers, Inc. v. Commissioner
Docket No. 66736.
United States Tax Court
T.C. Memo 1960-47; 1960 Tax Ct. Memo LEXIS 242; 19 T.C.M. (CCH) 226; T.C.M. (RIA) 60047; 11 Oil & Gas Rep. 957; March 23, 1960
*242 Robert B. Wallace, Esq., for the petitioner. Harold A. Chamberlain, Esq., and Robert L. Liken, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for fiscal years ended November 30, 1953, 1954 and 1955, in the respective amounts of $9,993.59, $9,183.16 and $3,071.57. Petitioner claims overpayments for fiscal 1954 and 1955 in the respective amounts of $12,097.93 and $6,318.92. The issue still in controversy is whether the depreciation deduction claimed by petitioner for its drilling Rig No. 2 in each of the years in issue was reasonable in amount. In its brief, petitioner accepts respondent's adjustments to the depreciation deductions claimed for drilling Rig No. 1 and Motor No. 1. Findings of Fact The stipulated facts are found. Petitioner is a Texas corporation with its principal office in Corpus Christi, Texas. It filed its returns for the years in issue with the district director of internal revenue, Austin, Texas. At all material times M. D. Gowland, an officer of petitioner, maintained petitioner's books and records. He was a certified public accountant *243 and served as petitioner's accountant. Except for capital gains, petitioner derived its income from drilling and reworking oil wells during the years in controversy. In December 1948, petitioner purchased drilling Rig No. 1 and used it as an oil well work-over rig. In February 1953, petitioner purchased another drilling rig, sometimes hereafter called Rig No. 2, at a cost of $143,060.57. This cost included all the equipment necessary for drilling oil wells. During fiscal 1953, 1954 and 1955, petitioner used Rig No. 2 as an oil well drilling rig and, according to its income tax returns, made no capital additions to it. During fiscal 1953, petitioner used Rig No. 2 at a site approximately 40 miles south of Hebbronville, Texas, sometimes hereafter called the Hebbronville area. Dur to the presence of caliche (calcium carbonate crusts), boulders and rock in the subsurface, this area was one of the more difficult drilling areas in southwest Texas. A rig had to be rotated at high revolutions per minute in order to make a hole. Drilling through caliche and rock caused the rig to vibrate. This rig drilled to depths of 5,000 to 5,500 feet, which were deep for it. During petitioner's *244 drilling operations in the Hebbronville area, Rig No. 2 suffered more than normal depreciation. During fiscal 1954 and 1955, petitioner used Rig No. 2 at a site approximately 30 miles south of San Antonio, Texas, in Atascosa County, sometimes hereafter called the Atascosa area. The Atascosa area was sandy and windy. At times these conditions caused drivers of motor vehicles to use headlights in the daytime. Except for a drought in fiscal 1954, water conditions were good in this area. The drilling performed by Rig No. 2 in the Hebbronville area was more difficult than that performed in the Atascosa area. Petitioner's income tax returns for fiscal 1953 through 1955 reported the following depreciation schedules for Rig No. 2 (in even dollars): Prior depre-
Remaining
Depreciation
Fiscal year
ciation
life or
deduction
ended 11/30
Cost
(cumulative)
Balance
years
claimed
1953
$143,060
$143,060
3 years
$39,739
1954
143,060
$39,739
103,321
26 months
47,686
1955
143,060
87,425
55,634
18 months
37,089
At the end of each year petitioner's accountant prepared a depreciation schedule for income tax purposes. He recorded *245 the total amount of depreciation shown on that schedule in both a journal and the respective income tax return. The depreciation schedules on petitioner's returns from fiscal 1953 through 1955 reflected its respective books and records for that period. Originally, petitioner's officers determined that the useful life of Rig No. 2 would be 4-5 years. For each of the fiscal years from 1953 through 1955, petitioner's accountant intended to compute depreciation for this rig on the declining balance method by applying a percentage rate against a declining balance and not against the original cost. Petitioner's officers considered the factor of usage in determining the amount of depreciation for each of the fiscal years in controversy. Petitioner's income tax returns for fiscal 1952 through 1955 reported the following items of gross income, repairs and supplies, depreciation deductions for all equipment and net profit (in even dollars): 1952
1953
1954
1955
Gross income
$165,218
$352,428
$392,180
$357,377
Repairs and supplies
14,595
60,800
41,690
51,334
Depreciation deductions
for all equipment
15,705
58,628
63,300
50,482
Net profit
18,387
22,730
40,782
20,131
*246 From fiscal 1953 through 1955, petitioner's returns reflected that the depreciation deductions claimed for all equipment were approximately proportionate to its respective gross income. During each of the fiscal years 1953 through 1955, petitioner made repairs and replacements to Rig No. 2. In fiscal 1955 petitioner had ample time to repair and maintain this rig. In June 1955, petitioner purchased for Rig No. 2 new motors or engines, hereafter called Motors No. 2, at a cost of $20,000. One of the reasons for this purchase was to obtain more usage from Rig No. 2. For purposes of depreciation petitioner's accountant treated Motors No. 2 separately in petitioner's fiscal 1955 records and return. Petitioner claimed $4,000 as a depreciation deduction for Motors No. 2. On April 20, 1959, Rig No. 2 was still an asset in petitioner's business but it was not currently utilized in any of petitioner's operations. It was capable of at least one more year's use, if used under normal conditions. Except for petitioner's use of Rig No. 1 as a work-over rig and use of Rig No. 2 as a drilling rig, there was no fundamental difference between the two rigs. Both were commonly known as portable *247 drilling rigs and were to be distinguished from larger drilling rigs which were not portable. About the time that World War II ended, the oil and gas industry started to produce and use portable drilling rigs for oil and gas well operations. Prior to this time there were in production and use portable drilling rigs for water well operations. A portable drilling rig does the same work as a large drilling rig and operates at its maximum capacity the entire time. A large drilling rig does not wear appreciably when operating at a portable drilling rig's maximum depth. A portable drilling rig has a telescoping derrick which is made in two sections. The upper section telescopes in and out of the lower section. The derrick is built on a steel structure. Drawworks, two engines or motors and a pump are mounted on a steel structure. On one end of the steel structure a fifth wheel is mounted which enables a truck to tie on and pull the rig over the highway. The drawworks and engines in a portable drilling rig are not as strong and large as those in a large drilling rig. Equipment in a portable drilling rig is lighter than equipment in a large drilling rig. In 1953, the cost of a portable *248 drilling rig was approximately $143,000. The cost of a large drilling rig was dependent upon the depth to be drilled and would be anywhere from $300,000 to $750,000. The average useful lives of large and portable drilling rigs, under normal conditions, were approximately 8 and 6 years, respectively. At all material times the operating use of drilling rigs in the oil and gas industry, under normal conditions, is approximately 50 per cent of the time. This leaves time to repair and maintain the equipment. At all material times there was a relationship between the useful life of a drilling rig and the number of feet to be drilled, the drilling site and the speed used in drilling. In July 1956, Internal Revenue Agent John B. Davis, Jr., examined petitioner's returns for fiscal 1954 and 1955 and proposed certain adjustments in petitioner's income tax for those years. Petitioner's accountant believed that Davis reached these proposed adjustments by computing petitioner's depreciation deductions on a "33 1/3 per cent declining balance method." Shortly thereafter, petitioner paid to the district director of internal revenue, Austin, Texas, the amount of $18,416.85 by check dated July 20, 1956. This *249 payment represented an additional tax payment of $11,145.13 and interest of $952.80 for fiscal 1954 and an additional tax payment of $6,161.85 and interest of $157.07 for fiscal 1955. About a month later Davis notified petitioner's accountant that he intended to consult with one of respondent's engineer revenue agents. The agents then included in their examination petitioner's return for fiscal 1953. The engineer agent discussed with petitioner's accountant the type of rigs used, the type of work done, the number of days the rigs worked and the difficulty of the drilling done by the rigs. In addition, the engineer agent was shown petitioner's records supporting these facts. Neither Davis nor the engineer agent requested to look at Rig No. 1 and Rig No. 2. In the latter part of 1956, Davis prepared a "Transmittal Letter," dated July 5, 1956, proposing adjustments in petitioner's income tax liability for the years in issue as follows (in even dollars): Proposed defi-
Total disal-
ciency in in-
lowed depre-
come tax based
ciation de-
on adjustment
ductions
Disallowed
to petitioner's
(Rig No. 1,
depreciation
Allowable de-
claim for de-
Motor-Rig
deductions
preciation de-
Fiscal year
preciation
No. 1 and
for Rig
ductions for
ended 11/30
deductions
Rig No. 2)
No. 2
Rig No. 2
1953
$ 9,993
$13,302
$ 9,934
$29,804
1954
20,328
37,562
29,804
17,882
1955
9,233
20,190
19,207
17,882
*250 In the space provided for "Other Information" there was written the following: "Partial payment of principal and interest has been made in the amount of $18,416.85 * * *. This payment was made when the taxpayer agreed to the original report." Among other things, the basis for this "Transmittal Letter" was an audit held on July 5, 1956, and a report of respondent's engineer agent dated October 18, 1956, which provided, in part: "Depreciation has been reduced for all three periods under examination as the result of correcting the rate of depreciation on drilling rigs. This taxpayer depreciated rig #1 on the declining balance for the first three periods and then started using a straight line method for this rig. When rig #2 was acquired in 1953 this taxpayer computed depreciation on the straight line for both rigs. All other equipment has been on the straight line from the beginning. For this reason it is the writers [writer] opinion that this taxpayer is bound by the straight line method until he gets permission to change from the Commissioner of Internal Revenue. "A rate of 25% has been used for the first period rig #2 was used because it was drilling in a very difficult location *251 where wear and tear is much greater than normal and was used all of the remaining days of the accounting period in this work. The average drilling days per year for most rigs is from 200 to 250 days whereas this rig was used at the rate of about 360 days. For this reason the rate for this first period [fiscal 1953] was increased to 25% and when the rig was moved to and average drilling condition the rate was reduced to 12 1/2% [for fiscal 1954 and 1955]. Salvage values * * * [for Rig No. 1, Rig No. 2 and Motor No. 1 are $10,553.58, $14,306.06 and $471.69, respectively] and depreciation will stop when the book value reaches this point. These rigs are being depreciated on a percentage of cost method instead of a remaining life method because this yields a reasonable result." On January 21, 1957, respondent sent petitioner a deficiency notice for the years in issue which stated that "consideration * * * [had] been given to the report of examination dated July 5, 1956." Respondent disallowed petitioner's claim for depreciation deductions in the amounts shown in the "Transmittal Letter" dated July 5, 1956. He computed petitioner's final tax liability for the fiscal years in issue *252 as follows (in even dollars): 1953
1954
1955
Corrected income and
excess profits tax
$16,812
$36,437
$15,246
Less: Tax assessed
6,819
27,254
12,175
Tax deficiency
$ 9,993
$ 9,183
$ 3,071
During the fiscal years in issue, the useful life of Rig No. 2 in petitioner's business was 6 years. During the fiscal years 1953 through 1955, petitioner sustained allowable depreciation for Rig No. 2 in the respective amounts of $39,739, $23,833 and $23,833. Opinion The sole issue is one of fact and is disposed of in our ultimate finding. While the allowable depreciation so determined differs both from the amount set out in the deficiency notice and that deducted upon petitioner's returns, we think the evidence clearly indicates the correctness of the figures found. See Lake Charles Naval Stores, 25 B.T.A. 173. Respondent, in effect, determined that petitioner's drilling rig had an anticipated useful life of 8 years. We consider that the presumptive correctness of this action has been overcome by the affirmative evidence introduced on behalf of petitioner, including that of a disinterested and experienced witness, and that the appropriate *253 useful life was not 3 years as claimed by petitioner nor 8 years as determined by respondent, but was 6 years. It is also apparent that respondent's own agents concluded that the excessive use of the rig during the first fiscal year (10 months) entitled petitioner to twice the normal amount of depreciation for that period. Based on an anticipated useful life of 6 years, this happens to be a figure identical with that claimed by petitioner on its return for that year, thus indicating that petitioner itself regarded 6 years as the probable useful life. The record does not convince us that for the other 2 years involved petitioner is entitled to anything more than normal depreciation based upon a 6-year life. And the result would not as a factual matter be substantially different although slightly less favorable to petitioner, even though the figures suggested are employed on a declining balance method, which, however, respondent refused to permit petitioner to use. Decision will be entered under Rule 50.